IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AUTO-OWNERS INSURANCE COMPANY, a Michigan corporation,<br><br>Plaintiff,<br><br>v.<br><br>TIMBERSMITH, INC., a Utah corporation, GEORGE FLEMING, an individual, and JANIS FLEMING, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:12-cv-00786 |
| GEORGE FLEMING, an individual, and JANIS FLEMING, an individual,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>THE CHARTER OAK FIRE INSURANCE COMPANY, a Connecticut corporation,<br><br>Third-Party Defendants. | Judge Clark Waddoups |

This matter comes before the court on Third-Party Plaintiffs George and Janis Fleming's (collectively the Flemings') motion for summary judgment against Third-Party Defendant The Charter Oak Fire Insurance Company (Charter Oak) (Dkt. No. 44), the Flemings' motion for summary judgment against Plaintiff Auto-Owners Insurance Company (Auto-Owners) (Dkt. No. 48), Charter Oak's cross motion for summary judgment against the Flemings (Dkt. No. 61), and Auto-Owners' cross motion for summary judgment against the Flemings (Dkt. No. 110). The court held a hearing on the motions on February 17, 2016, and has carefully

considered the parties' briefs, arguments, record evidence, and relevant authorities. For the reasons that follow, the court GRANTS Charter Oak and Auto-Owners' motions for summary judgment (Dkt. Nos. 61, 110).

## BACKGROUND

This case arises out of allegations of defective construction against LC Builders and Cory Lowder (collectively LC Builders) and Timbersmith, Inc. The relationship between the Flemings, LC Builders, and Timbersmith began in January 2008 when the Flemings hired Timbersmith to construct a home in a ski resort community in Park City, Utah. (Dkt. No. 112-12, p. 4). LC Builders—working as either a subcontractor or as Timbersmith's employee—framed the house incorrectly and ultimately walked off the job, leaving the home barely standing. (Dkt. Nos. 44-9, 49-1, p. 15). As a result, the Flemings were required to hire other contractors to repair and replace substantial portions of the framing. This brought about two overlapping legal proceedings against LC Builders and Timbersmith to recover damages for these costs, one in state court and the other in arbitration.

The Flemings first filed suit in Utah State Court against LC Builders, bringing claims for negligence, breach of contract, promissory estoppel, quantum meruit, fraud, negligent misrepresentation, and breach of warranty. (Dkt. No. 44-9).[1] According to the Flemings, LC Builders was independently liable for the faulty construction of the home because it acted as Timbersmith's subcontractor for the duration of the project. When LC Builders' insurance carrier, Charter Oak,[2] was notified of the pending lawsuit, it denied coverage and declined to defend LC Builders, concluding that the Flemings had failed to establish that the damage to their

---

[1] The Flemings' charging document is referred to herein as the First Amended Complaint.

[2] This policy was initially issued by Travelers Casualty and Surety Company, but the parties substituted Charter Oak for Travelers. (Dkt. No. 27). For clarity's sake, the court refers only to Charter Oak throughout this opinion.

property was covered by LC Builders' policy (the Charter Oak Policy). (Dkt. Nos. 44-7, 44-8, 44-10). The Flemings pursued the litigation and ultimately obtained a judgment against LC Builders. The state court concluded that "Defendants LC Builders, Cory Lowder and their sub-contractors were negligent in the construction of the Fleming Residence. . . The Flemings have established as a matter of law that due to the negligence of the Defendants and their subcontractors the Flemings had to retain the services of new contractors to repair the damage to the Fleming Residence." (Dkt. No. 44-11, p. 3). Accordingly, the court awarded the Flemings $1,099,227.80 in damages for the costs to repair the defective framing, plus costs and expenses. (Dkt. No. 84-15, p. 3).

The Flemings also brought a claim in arbitration against Timbersmith, alleging that Timbersmith and LC Builders completed the framing improperly and failed to complete construction on the agreed-upon date. (Dkt. No. 84-16). In contrast to their theory of liability when pursuing damages against LC Builders alone, the Flemings contended that Timbersmith was liable for LC Builders' faulty workmanship because Mr. Lowder was, for the duration of construction, an employee of Timbersmith. (*Id.*). The Flemings sought summary judgment against Timbersmith, and, when Timbersmith did not oppose the motion, the arbitration panel entered an arbitration award in the Flemings' favor (the Arbitration Award). (Dkt. No. 84-17). The arbitration panel concluded that the Flemings were entitled to judgment against Timbersmith for damages in the amount of $1,099,277.80, as well as costs and fees. (*Id.*).[3] The Flemings then successfully sought confirmation of the arbitration award in the state court, which entered judgment in the Flemings' favor. Timbersmith's insurance carrier, Auto-Owners, did not defend

---

[3] It appears that the arbitration award for damages against Timbersmith contemplates the same damages as the judgment entered against LC Builders. The parties do not address whether the Flemings were entitled to recover for the same damages from both LC Builders and Timbersmith.

Timbersmith in the arbitration proceedings, and the parties dispute whether it had sufficient notice that a claim in arbitration had been filed against its insured.

After Auto-Owners learned of the entry of judgment against Timbersmith, it filed a complaint in state court against Timbersmith and the Flemings, seeking declaratory judgment that it owed no duty to defend or indemnify Timbersmith against the Flemings' judgment under the terms of its Commercial General Liability (CGL) insurance policy (the Auto-Owners Policy). (Dkt. No. 2-1). In turn, the Flemings removed the complaint to this court, filed a counterclaim against Auto-Owners, and filed a Third-Party Complaint against Charter Oak. (Dkt. Nos. 2, 22). The Flemings assert Auto-Owners and Charter Oak are obligated to indemnify the judgments against both Timbersmith and LC Builders pursuant to both companies' CGL policies. The parties have now filed cross motions for summary judgment on the issue of coverage.[4]

## ANALYSIS

In considering the parties' competing motions for summary judgment, the court treats each motion separately, drawing all reasonable inferences against the party whose motion is under consideration. *See Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014) (at the summary judgment stage, the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party"); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court first

---

[4] The Flemings also included a counterclaim against Auto-Owners for breach of the implied covenant of good faith and fair dealing but subsequently stipulated to dismissal of this claim. (Dkt. Nos. 99, 109). Accordingly, the only claims currently before the court are for declaratory judgment as to the issue of coverage under both policies.

considers the cross motions regarding Charter Oak's duty to indemnify before considering the cross motions regarding Auto-Owners' indemnification obligation.

### A.  *Charter Oak and the Flemings' Cross Motions for Summary Judgment*

The parties begin by addressing whether the Flemings' First Amended Complaint was sufficient to trigger Charter Oak's duty to defend LC Builders in the state court lawsuit, and, if so, whether Charter Oak can be bound by the state court's judgment against LC Builders. The Flemings argue that Charter Oak was required to defend LC Builders against the Flemings' claims, and, because it failed to do so, is prohibited from now contesting coverage. Thus, the Flemings assert Charter Oak is required to indemnify LC Builders for the entire state court judgment. (*See* Dkt. No. 22, pp. 11, 14). Charter Oak responds by arguing that the First Amended Complaint was not sufficient to trigger its duty to defend, and, in any event, the Charter Oak Policy does not provide coverage for the property damage for which the Flemings' claim indemnification. Accordingly, before turning to the issue of coverage, the court addresses the consequences of Charter Oak's failure to defend LC Builders in the state court lawsuit. Ultimately, the court concludes that even if Charter Oak breached its duty to defend LC Builders and is precluded from challenging the state court judgment, the Flemings are not entitled to indemnification under the Charter Oak Policy.

The Flemings are correct that "[a]s a general rule, when an insurer, whose policy requires it to defend its insured, receives notice of a suit against the insured and is allowed an opportunity to defend, but refuses, the insurer is bound by the findings and judgment therein." *Speros v. Fricke*, 98 P.3d 28, 39 (Utah 2004) (internal quotation marks and brackets omitted). But the Flemings err in arguing that this general rule precludes Charter Oak from now litigating any issues that are relevant to coverage. Indeed, the Utah Supreme Court has clarified that an insurer

who has failed to defend is not bound by "matters collateral or immaterial to the essential issues involved in the case." *McCarty v. Parks*, 564 P.2d 1122, 1123 (Utah 1977). "Consequently, an insurance company . . . should be afforded an opportunity to raise and have determined the issue as to its own liability, so long as doing so is not inconsistent with the findings on material issues which were determined between the plaintiff and defendant." *Id.*; *accord* Allan D. Windt, *Binding effect on insurer of a judgment against insured in the underlying action—Collateral estoppel*, 2 Insurance Claims and Disputes § 6:22 (6th ed.) ("Collateral estoppel works, however, only with regard to facts necessarily adjudicated in the lawsuit against the insured. Gratuitous statements in judgments, therefore, adjudicating facts that would result in the creation of coverage, but which facts did not truly determine the insured's liability and the amount of the damages should not give rise to collateral estoppel."). When the court evaluates the issues addressed and resolved in the state court proceedings against LC Builders under this standard, the only finding of fact and conclusion of law that could possibly bind Charter Oak is the finding that "Defendants LC Builders, Cory Lowder and their subcontractors were negligent in the construction of the Fleming Residence."

Indeed, the legal conclusion that LC Builders and its subcontractors' negligence resulted in the damages reflected in the judgment does not, as the Flemings claim, necessarily mean that there was coverage for this amount under the Charter Oak Policy. The state court was never asked to consider the issue of coverage, nor was it necessary for it to do so. On the claims and evidence presented to the state court, a judgment in the Flemings' favor would necessarily include the costs to repair and replace LC Builders' own defective work caused by LC Builders' negligence. But as the court explains in greater detail below, this type of damage is not covered under the Charter Oak Policy, or, for that matter, any other standard CGL policy. *See*

*Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1142 (10th Cir. 2005) ("Damage to an insured's own work resulting from his faulty workmanship on it is usually covered by a performance bond, not a commercial general liability policy."); Lee R. Russ & Thomas F. Segalla, 9 *Couch on Insurance* § 129:11 (3d ed. 1995 & Supp. 2005) ("Most policies of commercial general liability insurance exclude the insured's faulty workmanship from coverage. The rationale for such exclusions is that faulty workmanship is not an insurable 'fortuitous event,' but a business risk to be borne by the insured."). Thus, the judgment against LC Builders cannot be reasonably interpreted to preclude subsequent litigation to resolve the issue of coverage or the amounts due under the Charter Oak Policy for covered damage. Although Charter Oak may now be prohibited from contesting the factual finding that LC Builders and its subcontractors were negligent, it is not precluded from making arguments or presenting evidence relevant to the issue of coverage so long as they are not inconsistent with this finding. *See Speros* 98 P.3d at 39 (holding that insurer who failed to defend was bound by the factual findings giving rise to insured's liability).

Having established the consequences of Charter Oak's failure to defend LC Builders, the court concludes it is unnecessary to decide whether Charter Oak breached its duty to defend. This is because even accepting that Charter Oak is bound by the fact that LC Builders and its subcontractors were negligent, Charter Oak is not required to indemnify LC Builders for the state court judgment under the plain terms of the Charter Oak Policy.[5]

Turning to the issue of coverage, the court begins by examining the Charter Oak Policy under Utah law. *See Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th

---

[5] Although the court assumes, for the purposes of this opinion, that LC Builders used subcontractors in its framing of the home, the record evidence does not seem to support such a finding. To the contrary, Mr. Lowder stated in interrogatories that "Lowder was an employee of Timbersmith at all times when working on the project" and Robert Smith, the president of Timbersmith, submitted a declaration stating that "All work that Cory Lowder performed on the Fleming residence was in his capacity as an employee of Timbersmith." (Dkt. No. 62-1, pp. 8, 73). The Flemings provide no evidence to contradict these statements, which are confirmed by the fact that, when seeking to hold Timbersmith liable in arbitration proceedings, the Flemings themselves asserted that Mr. Lowder and his framing crews "were Timbersmith's employees working on the Flemings' home." (Dkt. No. 84-15, p. 3).

Cir. 2009) (in diversity jurisdiction case, federal court applies the substantive law of the forum state).[6] The Charter Oak Policy provides coverage for property *damage* caused by an *occurrence*.[7] (Dkt. No. 44-2, p. 4 (emphasis added)). Property damage means "Physical injury to tangible property, including all resulting use of that property . . . or . . . [l]oss of use of tangible property that is not physically injured." (*Id.* p. 5).

In turn, an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general or harmful conditions." (*Id.*, p. 14). Although the term "accident" is not defined by the Policy, the Utah Supreme Court has explained that "the word 'accident' is descriptive of means which produce effects which are not their natural and probable consequences." *Fire Ins. Exch. v. Estate of Therkelsen*, 27 P.3d 555, 559 (Utah 2001) (internal quotation marks and brackets omitted). Thus, "Under Utah law, when determining whether there is an accident, the court is not to examine whether the underlying act is intentional, deliberate, or foreseeable, but rather whether the result of the act was intended or expected from the perspective of the insured." *Cincinnati Ins. Co. v. Spectrum Dev. Corp.*, No. 2:11-CV-0015-CW, 2015 WL 730020, at *4 (D. Utah Feb. 19, 2015).

Accordingly,

a claim for faulty workmanship, in and of itself, is not an occurrence under a commercial general liability policy because a failure of workmanship does not involve the fortuity required to constitute an accident. Instead, what does constitute an occurrence is an accident caused by or resulting from faulty workmanship, including damage to any property other than the work product and damage to the work product other than the defective workmanship. In other

---

[6] In cases arising under diversity jurisdiction, the court is bound by the decisions of the forum state's highest court. In the absence of such binding authority, the court must attempt to predict what the state's highest court would do by seeking guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and "the general weight and trend of authority" in the relevant area of law. *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

[7] The property damage must also occur in the coverage territory during the policy period, but there is no dispute that these elements are met in this case.

> words, although a commercial general liability policy does not provide coverage
> for faulty workmanship that damages only the resulting work product, the policy
> does provide coverage if the faulty workmanship causes bodily injury or property
> damage to something other than the insured's work product.

9A Lee Russ & Thomas F. Segalla, *Couch on Insurance* § 129:4, at pp. 129–13 to 129–14 (3d

ed. 2005) (footnotes omitted); *accord Greystone Const., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661

F.3d 1272, 1282–83 (10th Cir. 2011), *as amended on reh'g in part* (Dec. 23, 2011) (recognizing

that "a strong recent trend in the case law interprets the term 'occurrence' to encompass

unanticipated damage to nondefective property resulting from poor workmanship," and holding

that "injuries flowing from improper or faulty workmanship constitute an occurrence so long as

the resulting damage is to nondefective property, and is caused without expectation or

foresight"); *Cincinnati Ins. Co. v. AMSCO Windows*, 921 F. Supp. 2d 1226, 1253 (D. Utah

2013), *aff'd*, 593 F. App'x 802 (10th Cir. 2014) (collecting cases and predicting that "the Utah

Supreme Court would conclude that an 'occurrence' within the meaning of Cincinnati's policy

language includes an accident caused by or resulting from faulty workmanship, including

damage to any property *other than the work product*" (internal quotation marks omitted)).

      Consistent with this definition, the Tenth Circuit has concluded that "damage to [a]

builder's work caused by the poor workmanship of a subcontractor can constitute an occurrence

in the first instance," *Greystone Const.*, 661 F.3d at 1290, because a subcontractor's negligent

acts are neither something that is to be expected nor the natural and probable consequences of the

way they are supervised, *Spectrum Dev. Corp.*, 2015 WL 730020, at *4; *accord Great Am. Ins.

Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275, 1281 (D. Utah 2006) (predicting that the

Utah Supreme Court would conclude that the negligent acts of subcontractors can be considered

an occurrence for the purposes of CGL policies).

The interpretation of the provisions just described is supported by, and consistent with, the business-risk exclusions contained in the Charter Oak Policy. Those exclusions are intended to further ensure that the insurance contract does not become a performance bond. *See Greystone Const.*, 661 F.3d at 1289 (citing *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 76 (Wis. 2004)) (recognizing that the business risk exclusions prevent coverage under CGL policies for breach of contract claims arising out of the insured's defective work); *Farmington Cas. Co.*, 417 F.3d at 1142 ("[F]inding the breach of a business contract to be a covered occurrence would distort the purpose of liability insurance policies." (quoting *Union Ins. Co. v. Hottenstein*, 83 P.3d 1196, 1202 (Colo. Ct. App. 2003) (internal quotation marks and brackets omitted)). Three business risk exclusions are relevant in this case, all of which have varying applicability depending on when the property damage occurs. *See, e.g.*, Scott C. Turner, *Insurance Coverage of Construction Disputes* § 33:1 (2d ed.) (describing the relationship between various business risk exclusions).

The first is exclusion j(5). It addresses damage arising out of a contractor or subcontractor's work that occurs while operations are ongoing. *See Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1011 (10th Cir. 2006) (explaining that this exclusion applies "to damage from ongoing work, and not damage after completion" (internal quotation marks and citations omitted)). Specifically, it excludes from coverage damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." (Dkt. No. 44-1, p. 73). "The intent of exclusion j(5) is to bar coverage for the work being done by a contractor when claims arise at the time the work is being performed. This bar exists irrespective of whether the claim is being made against the contractor

performing the work or the upstream contractor supervising the work." Robert J. Franco,

*Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies*, 30 Tort & Ins. L.J. 785, 796 (1995).

The second exclusion, exclusion j(6), excludes from coverage damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."[8] (Dkt. No. 44-1, p. 73). But notably, there is an exception to this exclusion for property damage included in the "Products Completed Operations Hazard." (*Id.*, p. 74). In turn, the Products Completed Operations Hazard includes "all 'property damage' occurring away from premises you own . . . and arising out of . . . 'your work.'" (Dkt. No. 44-2, p. 4). But work that has not yet been completed or abandoned is expressly excluded from the Products Completed Operations Hazard. (*Id.*). Thus, the effect of exclusion j(6) and the Products Completed Operations Hazard is to "exclude coverage for the cost of restoring, repairing or replacing faulty workmanship on the part of the insured, its contractors, and subcontractors . . . (i.e., work that 'was incorrectly performed') while the work is ongoing" but to provide coverage for damage to property that arises out of the faulty workmanship after the work is completed or abandoned. *See Advantage Homebuilding, LLC*, 470 F.3d at 1012 (internal quotation marks and brackets omitted)). The Tenth Circuit has used the following illustrative example:

> [A]ssume that a contractor is building a home. The contractor first erects the walls and completes the roof and then begins finishing the interior. Unfortunately, the roofing was poorly installed and later leaks, thereby damaging partially completed parquet floors. The damage to the floors which was a consequence of the faulty workmanship that occurred after the work was complete would be covered, but replacement of the poorly constructed roof which was a direct result of faulty workmanship that occurred while the work was ongoing would be excluded.

---

[8] "Your work" is further defined as "work performed by you or on your behalf; and materials parts or equipment furnished in connection with such work or operations." (Dkt. No. 44-2, p. 5).

*Id.* (internal quotation marks and brackets omitted)).[9]

The third exclusion, exclusion (*l*), is commonly referred to as the "your work" exclusion. Unlike exclusions j(5) and j(6), exclusion (*l*) applies to exclude coverage for damage that occurs after operations are complete. It states, "This insurance does not apply to 'Property Damage' to 'your work' arising out of it or any part of it and included in the 'Products Completed Operations Hazard.'" (Dkt. No. 44-1, p. 74). The Charter Oak Policy, however, contains an important exception to this exclusion. Specifically, it provides that the "your work" exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (*Id.*). Taken together, these provisions provide coverage for "damage to, or caused by, a subcontractor's work after the insured's operations are completed." Turner, *Insurance Coverage of Construction Disputes* § 33:9; *accord Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 82 (Wis. 2004) (explaining the subcontractor exception to exclusion (*l*) was relevant where the damage to the property occurred after the insured's work was substantially completed); *Kalchthaler v. Keller Const. Co.*, 591 N.W.2d 169, 174 (Wis. Ct. App. 1999), *abrogation on other grounds recognized by Yeager v. Polyurethane Foam Insulation, LLC*, 808 N.W. 2d 741 (Wis. Ct. App. 2011) (same). This exception is also best understood by way of illustrative example: A general contractor does some work on a home while the rest is done by subcontractors. The building is accepted by the owner. If the home is later damaged by a fire caused by electrical wiring installed by the subcontractor, the subcontractor exception to exclusion (*l*) applies and the damage will be covered. If, however, the wiring was installed by the

---

[9] Notably, the Tenth Circuit has rejected the argument that property damage may be covered by virtue of the products-completed operations hazard exclusion to exception j(6) so long as the insured is no longer working on the property. *See Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1011 (10th Cir. 2006) (explaining that the products completed operation hazard only applies to damage that occurs after the work is complete; thus, there is no coverage simply because the defective work may be discovered after the contractor has completed its work).

general contractor, the exclusion will apply. *See* Turner, *Insurance Coverage of Construction Disputes* § 33:9.

From these provisions, the court can distil that the Charter Oak Policy covers 1) damage to property other than the defective work completed by L.C. Builders that occurred while operations were ongoing, and 2) property damage to a subcontractor's or other work caused by a subcontractor's faulty workmanship that occurs after operations are completed. *See id.* § 3:11 ("Even under the Business Risk Doctrine, damage to other property that is neither the work nor the product of the insured generally remains covered. . . . coverage can even include property damage to non-defective parts of the insured's own work or products" (footnotes omitted)). With this in mind, the court considers whether the Flemings have provided sufficient evidence to establish that there exists property damage covered by the Charter Oak Policy that would trigger Charter Oak's obligation to indemnify LC Builders for that damage. The court concludes they have not.

First, the Flemings fail to identify who did what work, and when, making it impossible for the court to determine what property damage may be covered under the Policy. Indeed, the Flemings' own expert witnesses imprecisely refer to the defective work as that collectively performed by Timbersmith and LC Builders. (*See* Dkt. Nos. 44-2, p. 5 (Expert Scott Johnson stating, "The attached itemization correctly reflects that reasonable and necessary expenses for remediation, repairs, and damages resulting from the negligence of LC Builders *and* Timbersmith . . . ." (emphasis added)); 44-14, p. 9 (expert Cambria Flowers stating, "Timbersmith and LC Builders decided to leave the project in the July (sic) 2008, and various contractors were hired thereafter to identify, repair and otherwise mitigate construction problems that were left on-site . . . Ms. Flowers feels that the crux of her engineering efforts . . . were

solely to ensure adequate mitigation of the structural repairs and rebuilding that was required

because of the *construction negligence displayed by Timbersmith and LC Builders*.")). And

rather than providing an accounting of the precise work performed by the various entities, the

Flemings appear to seek indemnification for the full judgment against LC Builders. But they do

not explain how they could be entitled to indemnification for this entire judgment when it

appears to contemplate damages identical to those damages awarded in the arbitration

proceeding against Timbersmith for LC Builders' *and* Timbersmith's faulty work.

Relatedly, the Flemings fail to provide evidence to show that LC Builders or any

subcontractors caused damage to property other than that upon which LC Builders or any of its

subcontractors were operating that occurred while operations were ongoing. As explained, the

only damage the Flemings have identified is the defective work performed collectively by

Timbersmith, LC Builders, or, perhaps, LC Builders' subcontractors. (Dkt. Nos. 112-12, p. 2

(alleging in arbitration that "Timbersmith's waterproofing, lateral beams for the deck, stairs and

beams for roofing throughout the house, as well as other work, was not completed in accordance

with industry standards thereby creating numerous unsafe and hazardous conditions"); 44-6, p. 4

(alleging in the complaint that "in short, the overall framing of the home was done improperly,

requiring costly remediation")). Although it is not difficult to imagine that defective framing

could cause damage to other non-defective property, the Flemings have not directly identified

any. Rather, they rely on a vague assertion that as a result of the defective framing, the "entire

property was rendered unsafe." (Dkt. No. 81, p. 18).[10] But this does not provide the court with

---

[10] The Flemings also argue that the defective framing caused "undue delay in the construction of the home." (Dkt. No. 81, p. 18). But property damage requires at the very least the "[l]oss of use of tangible property" and the Flemings' briefing does not identify any specific tangible property, other than the defective framing, that was affected by Timbersmith, LC Builders, or any subcontractors' negligence. Moreover, any argument that the Flemings are entitled to damage for loss of use of property overlooks another specific exclusion in the Charter Oak Policy for the loss of use of property that is not physically injured and that arises out of "a defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'; or a delay or failure by you or anyone acting

sufficient information to conclude what, if any non-defective property was damaged as a result of LC Builders or LC Builders' subcontractors' negligence. The court is under no obligation to comb the voluminous record to find the evidence that may support coverage, and it declines to do so here. *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) "(To withstand a motion for summary judgment, the nonmovant must do more than refer to allegations of counsel contained in a brief. Sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein. Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." (internal quotation marks, citations, and alterations omitted)); *Craven v. Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1226 (10th Cir. 2001) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." (internal quotation marks omitted)). Certainly, even if there were some evidence to support a finding that there was damage to non-defective property, it would not extend to the full amount of the judgment entered in the state court proceedings against LC Builders, which undisputedly contemplates the costs to repair and replace LC Builders' own work. (*See* Dkt. No. 44-11, p. 3) (State court judgment stating that "The Flemings have established as a matter of law that *due to the negligence of the Defendants and their subcontractors* the Flemings had to retain the services of new contractors to repair the damage to the Fleming Residence." (emphasis added)).

---

on your behalf to perform a contract or agreement in accordance with its terms." (Dkt. No. 44-5, p. 28). Although this exclusion is not fully addressed by either party, it would appear to bar coverage for the loss of use of non-injured property caused by the defective framing. *See Wardcraft Homes, Inc. v. Employers Mut. Cas. Co.*, 70 F. Supp. 3d 1198, 1207 (D. Colo. 2014).

Finally, even assuming LC Builders used subcontractors whose work was defective, the Flemings do not argue or provide any evidence to suggest that LC Builders' subcontractors' negligence caused any property damage that occurred after operations were completed.[11] Indeed, the Flemings have always taken the position that the work performed on the home was defective at the time LC Builders abandoned the project.[12] And there is some evidence in the record that suggests that no damage occurred after abandonment. In fact, Mr. Fleming stated in his deposition that he was not aware of any such property damage, and the Flemings' expert opined that "deviations from plans caused precarious structural conditions, that left unattended *could have caused* severe physical injury to those on-site or severe damage to other parts of the building and site." (*See* Dkt. Nos. 62-1, p. 69; 49-1, p. 9 (emphasis added)). Because the Flemings identify no property damage that occurred after the alleged abandonment, they cannot establish that there is coverage under the Charter Oak Policy for any damage that resulted from LC Builders' subcontractors' negligence.[13]

For all these reasons, the Flemings have failed to present evidence from which a jury could conclude that they suffered any property damage that is covered by the Charter Oak

---

[11] The court rejects the notion that the subcontractor exception acts to provide coverage for all claims of defective subcontractor work, regardless of when the damage occurs, because it is merely an exception to an exclusion. *See Gibbs M. Smith, Inc. v. United States Fidelity & Guaranty Co.*, 949 P.2d 337, 342–43 (Utah 1997). And the court cannot apply the subcontractor exception to provide coverage to repair or replace defective workmanship that occurred when operations were ongoing, because that would render j(5) and j(6)'s explicit exclusions meaningless. *Cf. LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988) ("[I]t is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be given effect if it is possible to do so.").

[12] The court assumes, for the Flemings' benefit, that LC Builders' decision to walk off the project constitutes abandonment sufficient to trigger application of the Projects Completed Operations Hazard.

[13] Charter Oak directs the court to evidence indicating that some concrete had to be chiseled out to move pipes that were placed incorrectly because of the defective framing. (*See* Dkt. No. 62, pp. 14–15). If LC Builders used subcontractors whose defective work caused damage to this concrete, the cost to remediate it might be covered under the Charter Oak Policy. But the Flemings do not argue that they are entitled to coverage for the cost to replace the concrete. In fact, they object to the court's consideration of this evidence on relevance grounds. (Dkt. No. 81, p. 8). And in any event, the Flemings do not provide evidence that would show that LC Builders' subcontractors worked on the particular part of the framing that caused damage to the concrete. Thus, there is not a sufficient factual basis from which a jury could conclude that the Flemings are entitled to coverage for these costs.

Policy. Thus, Charter Oak is entitled to summary judgment that it has no obligation under the Charter Oak Policy to indemnify LC Builders for any part of the state court judgment.

### B. Auto-Owners' and the Flemings' Cross Motions for Summary Judgment

Auto-Owners and the Flemings' cross motions for summary judgment on the issue of coverage under the Auto-Owners Policy present arguments substantially similar to those discussed above regarding Charter Oak. Specifically, the Flemings begin by claiming that Auto-Owners should be bound to indemnify Timbersmith for the entire amount of the state court judgment against Timbersmith because it failed to defend Timbersmith in the arbitration proceedings. In turn, Auto-Owners contends that it had insufficient notice of the arbitration proceeding to trigger its duty to defend. Further, Auto-Owners asserts that it was prejudiced by the lack of notice, discharging it entirely of its obligation to indemnify. (Dkt. No. 110, p. 13).

For substantially the same reasons the court found that Charter Oak is not required to indemnify LC Builders under the Charter Oak Policy,[14] the court concludes that Auto-Owners is not required to indemnify Timbersmith for the state court judgment, even assuming Auto-Owners breached its obligation to defend Timbersmith in the arbitration proceedings. Even assuming that the Arbitration Award or state court judgment against Timbersmith binds Auto-Owners, the Flemings fail to identify any property damage that would be covered by the Auto-Owners Policy. Consequently, the Flemings are not entitled to indemnification from Auto-Owners and the court need not address whether Auto-Owners' indemnification obligation is discharged because of potential notice issues.

---

[14] The relevant portions of the Charter Oak and Auto-Owners Policies are substantially the same. There is only one substantive difference of note: the "your work" exclusion contained in the Auto-Owners Policy does not contain a subcontractor exception. This difference does not matter here, because the Flemings have failed to show that Timbersmith's work caused damage to any non-defective property.

**CONCLUSION**

For the foregoing reasons, the court **GRANTS** Charter Oak's and Auto-Owners' motions for summary judgment (Dkt. Nos. 61, 110) that they are not obligated to indemnify their insureds for the state court judgments against LC Builders and Timbersmith. The court directs the Clerk of Court to enter final judgment in Charter Oak's and Auto-Owners' favor.

SO ORDERED this 15th day of June, 2016.

BY THE COURT:

Clark Waddoups
United States District Court Judge